# Rowland and Ervien *versus* The Pennsylvania Railroad Company.

1. Millers in Philadelphia bought grain west of Pennsylvania, not the product of her soil, shipped it to Pittsburgh, and thence by railroad to Philadelphia. *Held*, that this was not "*local freight*" within the meaning of the Commutation Act.

2. The grain in such case was not a domestic product, nor was it sent from Pittsburgh to Philadelphia in the exercise of a domestic trade; it was imported for manufacturing an article of trade.

3. Where grain is bought out of Pennsylvania by a dealer in produce in Pittsburgh, shipped to that place and stored there for his business there; a portion of it afterwards transported by railroad to be sold in Philadelphia, is "*local freight,*" it being *domestic trade* in extra-territorial products, and stands on the same ground as trade in domestic products.

THIS was a bill in equity in the Supreme Court, by Rowland & Ervien against the Pennsylvania Railroad Co. The bill set out that the complainants were millers in Philadelphia; that they had been in the habit of purchasing large quantities of grain at places west of Pennsylvania and not the product of its soil, and also of soliciting and accepting consignments of such grain, and in either case the grain was transported to Pittsburgh, offered by their agents to the defendants, received, transported and delivered by them to the complainants in Philadelphia, who ground it at their mill, having first purchased in Philadelphia what had been consigned to them at shippers' risk; that in accordance with the Act of March 7th 1861, for the commutation of tonnage duties, by a toll sheet filed in the auditor-general's office, the rate of "local freight" on grain from Pittsburgh to Philadelphia was fixed at 36 cents per 100 pounds, and charged that the defendants were therefore bound to carry all grain offered at the terminus of their road at Pittsburgh for 36 cents per 100 pounds; but that since April 1st 1865, they have charged 55 cents per 100 pounds, claiming that they might legally discriminate in their charges between grain grown in Pennsylvania and that grown without and brought into the state for the purpose of being made into flour; and prayed for an injunction against the defendants to restrain them from making such charges, for an account of overcharges and repayment to the complainants.

The defendants in their answer averred, that it is the true intent and meaning of the Commutation Tonnage Act of 1861, that a discrimination shall be made between the products of the soil and the industry of other states, which is brought within this Commonwealth with intent that the same may be shipped over the line of the respondent's road upon its way to market, and the products of the soil of Pennsylvania or of the industry of its citizens.

A general replication was filed, and the case referred to Garrick Mallery, Esq., Master, who reported as his conclusion:—" The

[Rowland v. Pennsylvania Railroad Co.]

simple question in this case is, whether wheat purchased beyond the limits of Pennsylvania, and brought to Pittsburgh and then shipped by the Pennsylvania Railroad to Philadelphia, with the alleged intent as stated, simultaneous with the foreign purchase or consignment, is entitled to the benefit of local freight? And it is my opinion that it is not, and that the plaintiffs have not sustained their claim, and that their bill be dismissed."

The plaintiffs excepted to the report.

*J. Cooke Longstreth*, for complainants.—In Pennsylvania a railroad company is bound to carry goods at rates alike to all: Sandford *v.* Catawissa Railroad, 12 Harris 378; Twells *v.* Pennsylvania Railroad, 12 Am. Law Reg. 728. The English authorities qualify this rule only by the cost to the company of transportation and risk: Nicholson *v.* Great Western Railroad, 94 E. C. L. R. 366; Piddington *v.* South Eastern Railroad, Id. 111.

The grain in this case being to be manufactured in the state, was for its internal trade, and therefore, within the meaning of the Act of March 7th 1861, Pamph. L. 88, and was to be considered local freight: Penna. Railroad *v.* Canfield, May 1864, unreported. In Shipper *v.* Detwiler, 11 Wright 338, the payment of the freight was voluntary after notice to the plaintiff of the rates, which implied a promise to pay them: Garton *v.* Bristol & Exeter Railway Co., 101 E. C. L. R. 112. This was not local freight, because, 1st. Its transportation was in the prosecution of our own internal trade. 2d. It was not covered by through bills of lading. 3d. It was offered directly to the company at Pittsburgh for transportation over their own road only.

*Theo. Cuyler*, for defendant.—"Local freight" is not only domestic products, but also articles transported in our own internal trade, as contrasted with those brought from abroad into the state or carried through by continuous transit: Shipper's Case, *supra*.

In Canfield's case the grain had been unshipped and warehoused at Pittsburgh with the intention of selling it there, and afterwards a portion was transported to Philadelphia. Railway corporations receive their franchises for public use, and all doing business with them have a right to equal justice: Sandford *v.* Catawissa Railroad, *supra*; Parker *v.* Great Western Railway, 7 M. & G. 253; Crouch *v.* London & North Western Railway, 2 C. & K. 789. But here authority for the discrimination is given by the Act of Assembly.

Reshipment at Pittsburgh cannot deprive the company of the rate which is lawful on an article forwarded from Wheeling to Philadelphia.

The opinion of the court was delivered, May 15th 1866, by

WOODWARD, C. J.—The act for the commutation of the tonnage tax, passed 7th March 1861, first came up, for judicial construction in the case of Shipper and Detwiler *v.* The Pennsylvania Railroad Co., before me at Nisi Prius, and I filed an opinion which I am sorry the reporter thought proper to suppress in his subsequent report of the affirmance of the judgment in 11 Wright 338. " Local freights," an expression on which the construction of the act depended, were defined to " include the productions of Pennsylvania mines and manufactories wherever situated—all those things which the preamble to the act denominates domestic products." And it was said the expression " stood contrasted in the legislative mind with products *ab extra*—those which should be brought to market over the road from beyond our borders, whether from foreign countries or from sister states." When this opinion came up for review, this definition of local freights was extended to embrace " articles transported in the prosecution of our own internal trade, as contrasted with those brought from abroad into the state or carried through by a continuous transit." See opinion of Strong, J., 11 Wright 344.

The grain and flour, which were the freight in question in that case, were brought from Wheeling to Pittsburgh and there shipped upon the railroad to Philadelphia.

The next case that came up under the commutation law was Canfield's, decided at Harrisburg in May 1864, in an opinion by Strong, J., not yet reported. The plaintiff was a dealer in grain and produce at Pittsburgh, where he resided, that being his ordinary and regular market. His purchases were made in Western Pennsylvania, Ohio and elsewhere, and the goods were shipped to him at Pittsburgh. In January 1863 he bought wheat at Cincinnati, and had it shipped by river to him at Pittsburgh. When it arrived, he put it in store for sale; subsequently he shipped a portion by railroad to Philadelphia, that city offering for the time a better market.

This shipment to Philadelphia was held to be of local freight within the meaning of the Commutation Act, and entitled to the benefit of the reduced rates. This was an instance of *domestic trade* in extra-territorial products, and was put upon the same ground as trade in domestic products.

The case now presented is that of millers in Philadelphia buying grain west of Pennsylvania not the product of the soil of the state, and shipping it to Pittsburgh and thence by the railroad to Philadelphia at the rate of 55 cents per hundred pounds from Pittsburgh to Philadelphia, the rate for local freight of grain between these points being 36 cents per hundred pounds. It is this excess over local freight that is sought to be recovered back. The question is, whether the plaintiffs' grain was " local freight" within the meaning of the Commutation Act.

It clearly was not if the definitions of local freight in the two cases cited above are to be followed. It was neither a domestic product nor was it sent from Pittsburgh to Philadelphia in the exercise of a domestic trade, but was imported for manufacturing an article of trade. If such an article coming from abroad for such a purpose can be regarded as local freight, then everything which a citizen may import would be local freight, whether teas from China or hides from Brazil, and the distinction which the statute creates would be obliterated.

The statute was not perhaps wise in conception, as it certainly was very obscure in expression, but we have tried to extract its meaning and to administer it in the several cases according to the legislative intent. It does not present the question, either in form or principle, that was litigated in Sandford *v.* The Catawissa Railroad Co., 12 Harris 378, for the distinction complained of here is not created by *corporate action*, so much as by *legislative power*. And, although the distinction between this case and Canfield's is nice, yet it is as appreciable as the distinction between a merchant and a manufacturer. We think we are guilty of no inconsistency in affirming this decree after what we decided in that case.

The decree is affirmed.